## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **WENDY TWILLEY,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.: 4:17-cv-00260-MHH** |
| } | |
| **NANCY A. BERRYHILL, Acting** } | |
| **Commissioner, Social Security** } | |
| **Administration;** } | |
| } | |
| **Defendant.** } | |

## MEMORANDUM OPINION

Pursuant to 42 U.S.C. § 1383(c)(g), plaintiff Wendy Twilley seeks judicial review of a final adverse decision of the Commissioner of the Social Security Administration denying her application for supplemental security income ("SSI"). For the reasons stated below, the Court affirms the Commissioner's decision.

## I.      PROCEDURAL HISTORY

On September 12, 2013, Ms. Twilley protectively filed an application for SSI, alleging that her disability began on June 1, 2007. (Doc. 6-3, p. 22; Doc. 6-6, p. 2-7; Doc. 6-7, p. 22). Subsequently, Ms. Twilley amended the onset date to September 12, 2013. (Doc. 6-3, p. 43). On December 13, 2013, the Commissioner initially denied her claims. (Doc. 6-3, p. 22).

On February 11, 2014, Ms. Twilley requested a hearing before an ALJ. (Doc. 6-3, p. 22). On April 8, 2015, the ALJ held a hearing on Ms. Twilley's claims. (Doc. 6-3, pp. 39-66). On June 19, 2015, the ALJ issued an unfavorable decision and found that Ms. Twilley was not disabled. (Doc. 6-3, pp. 19-34). On August 20, 2015, Ms. Twilley asked the Appeals Council to review the ALJ's decision. (Doc. 6-3, p. 15). On December 15, 2016, the Appeals Council denied Ms. Twilley's request for review. (Doc. 6-3, p. 2).

## II.  STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and her 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec. Admin.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th

Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III. SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

In this case, the ALJ found that Ms. Twilley had not engaged in substantial gainful activity since September 12, 2013, the amended onset date. (Doc. 6-3, p. 24). The ALJ determined that Ms. Twilley suffers from the following severe impairments: "migraines, history of pseudo seizure disorder, mitral valve disorder, history of asthma, fibromyalgia, and obesity." (Doc. 6-3, p. 24). The ALJ also determined that Ms. Twilley "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404 Subpart P, Appendix 1." (Doc. 6-3, p. 27).

With respect to the identified impairments, the ALJ evaluated Ms. Twilley's RFC and found that Mr. Twilley has:

> the [RFC] to perform light work as defined in 20 CFR 416.967(b) except that [Ms. Twilley] can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but can never climb ladders and scaffolds. The claimant can tolerate occasional exposure to extreme cold and heat, but should never be exposed to unprotected heights, moving mechanical parts, or operating a motor vehicle for commercial purposes. [Ms. Twilley] should avoid large bodies of water and have no more than occasional exposure to dust, odors and pulmonary irritants. [Ms. Twilley] is limited to simple tasks and few changes in a routine work setting due to possible pain distractions.

(Doc. 6-3, p. 28).

The ALJ found that Ms. Twilley "has no past relevant work." (Doc. 6-3, p. 33). Based on the testimony of a vocational expert, the ALJ found that "there are jobs that exist in significant numbers in the national economy that [Ms. Twilley] can perform" including garment folder, small products assembler, or office helper.

(Doc. 6-3, pp. 33-34). Therefore, the ALJ concluded that: "[Ms. Twilley] has not been under a disability, as defined in the Social Security Act, since September 12, 2013, the date the application was filed." (Doc. 6-3, p. 34).

On appeal, Ms. Twilley has raised multiple challenges to the ALJ's decision. The Court considers each argument in turn.

## IV. ANALYSIS

### A. Substantial evidence supports the ALJ's credibility determination.

Ms. Twilley argues that ALJ failed to properly state reasons for discounting her credibility. (Doc. 11, p. 24). "To establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test by showing '(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.'" *Zuba-Ingram v. Comm'r of Social Sec.*, 600 Fed. Appx. 650, 656 (11th Cir. 2015) (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam)). A claimant's testimony coupled with evidence that meets this standard "is itself sufficient to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citation omitted).

If the ALJ discredits a claimant's subjective testimony, then the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225.

"While an adequate credibility finding need not cite particular phrases or formulations[,] broad findings that a claimant lacked credibility . . . are not enough . . . ." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) (per curiam); *see* SSR 96-7P, 1996 WL 374186 at *2 ("The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.").

Ms. Twilley reported limitations related to migraines and fibromyalgia, among other issues. (Doc. 6-7, p. 13). In her function report, she stated that sometimes she has to stay in bed all day if she has a bad migraine. (Doc. 6-7, p. 26). She also reported that she sometimes cooks for her children, she can drive when she is not having a migraine or a seizure, and she goes shopping about once a week. (Doc. 6-7, pp. 28-29).

At the administrative hearing, Ms. Twilley testified that she has migraines approximately three times per month, and her migraine headaches typically last one week. (Doc. 6-3, pp. 46-47). She reported taking medication, but she stated that it does not work. (Doc. 6-3, p. 48). She explained that when she has a migraine, she must lie down in a dark room. (Doc. 6-3, p. 48). She stated that her daughter does most of the housework. (Doc. 6-3, p. 53). She also stated that she

has fibromyalgia that causes her pain. (Doc. 6-3, p. 49). Ms. Twilley stated that in a 12 month period, she may have stress-induced seizures in eight of those months. (Doc. 6-3, p. 58). Sometimes three days pass between the seizures, and other times, seizures may occur in two-week intervals. (Doc. 6-3, pp. 58-59).

The ALJ found that "[Ms. Twilley's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Ms. Twilley's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ." (Doc. 6-3, p. 31).

The ALJ determined that a "lack of medical treatment and objective abnormalities undermines the claimant's allegations about the debilitating nature of her impairments." (Doc. 6-3, p. 31). Regarding headaches and seizures, the ALJ stated that the record does not contain "a longitudinal treatment history of [Ms. Twilley's] impairments, only a few hospital visits." (Doc. 6-3, p. 31). The ALJ recognized that Ms. Twilley's doctor stated that she had multiple admissions and consultations, but the ALJ noted that the doctor did not provide "treatment records or objective medical evidence to support his statement." (Doc. 6-3, p. 31). In addition, the ALJ observed that Ms. Twilley's test results generally were normal. (Doc. 6-3, p. 31). With respect to Ms. Twilley's fibromyalgia, history of asthma, and mitral valve disorder, the ALJ observed that Ms. Twilley "received little or no treatment." (Doc. 6-3, p. 31). The ALJ noted that Ms. Twilley's doctor, Dr.

Sesay, found that Ms. Twilley suffers from fibromyalgia, but the ALJ observed that there were no treatment records, and examination records contained normal findings. (Doc. 6-3, p 31). The ALJ also determined that Ms. Twilley's "activities of daily living are greater than what one would expect of a fully disabled individual." (Doc. 6-3, p. 32). In addition, the ALJ explained that Ms. Twilley's work history undercuts her testimony. (Doc. 6-3, p. 32).

In her brief, Ms. Twilley states that the evidence "does reveal six admissions and/or ER visits for migraine headaches with seizures." (Doc. 11, p. 21).[1] Otherwise, Ms. Twilley does not identify evidence in the administrative record that contradicts the ALJ's findings. The Court has examined the medical evidence and the evidence concerning Ms. Twilley's daily activities and finds that substantial evidence supports the ALJ's credibility determination.

### i. Medical Treatment

When evaluating the credibility of the claimant's reports of the severity of her condition, an ALJ may examine the extent to which a claimant has sought medical treatment. SSR 96-7p, 1996 WL 374186, *7.[2] An ALJ also may consider

---

[1] Ms. Twilley cited Doc. 6-8, p. 15-19 ("Discharge Summary, CT Abdomen & Pelvis, Chart Notes, dated September 3, 2013); Doc. 6-8, p. 25-34 (ER Records, CT Head, dated November 4, 2013); Doc. 6-8, p. 35-56 (Discharge Report, History & Physical, CT Scan Abdomen & Pelvic Consultation Lab dated August 27, 2011 to March 29, 2012); Doc. 6-8, p. 57-63 (Emergency Room Records, Xray Chest dated July 1, 2013); and Doc. 6-8, p. 3-30 (Emergency Department Records dated December 3, 2014 to March 4, 2015). (Doc. 11, p. 21).

[2] On March 28, 2016, SSR 16-3p superseded SSR 96-7p, the ruling concerning subjective

whether tests results in medical records reveal normal findings. *Brown v. Comm'r of Soc. Sec.*, 680 Fed. Appx. 822, 826 (11th Cir. 2017) (evidence supported the ALJ's determination that claimant was only partially credible where no physician suggested claimant could not work, physicians reported mostly normal conditions, MRI scans were normal, doctors recommended conservative treatments, and claimant could engage in a range of activities.).

### 1. Headaches / Seizures

Ms. Twilley's medical records show that from August 27, 2011, to March 4, 2015, Ms. Twilley went to the hospital because of seizures on three occasions. On another occasion, she was observed having a seizure. On four other occasions, she reported a prior history of seizures. (Doc. 6-8, pp. 18, 25-26, 41, 45, 57; Doc. 6-9, pp. 96-97, 99-100; Doc. 6-10, p. 3). This objective evidence contradicts Ms. Twilley's testimony about the frequency of seizures. Furthermore, Ms. Twilley's medical records do not show that she sought regular, "longitudinal treatment" for her seizures outside of her hospital visits.

Dr. Sesay stated that Ms. Twilley "had multiple admissions and consultations," but he did not provide or refer to records to support his statement (*see* Doc. 6-8, p. 67), and neither did Ms. Twilley (*see* Doc. 11, pp. 24-29).

---

complaints of pain that was in effect when the ALJ issued a decision in this case. *See* 2016 WL 1237954, at *1.

Test results from Ms. Twilley's visits to the hospital and to doctors are normal. For example, on August 27, 2011, Ms. Twilley's EEG, MRI, and CT tests revealed unremarkable findings. (Doc. 6-8, pp. 53-55).[3] A July 1, 2013 physical exam produced unremarkable findings. (Doc. 6-8, p. 61). A November 4, 2013 physical exam revealed normal findings, and the doctor reported that Ms. Twilley was oriented, her cranial nerves were within normal limits, and she had no motor or sensory deficits. (Doc. 6-8, p. 28). A CT scan that day revealed no intracranial abnormalities. (Doc. 6-8, p. 29). On December 23, 2014, and again on January 20, 2015, Dr. Mohamed Jasser noted that Ms. Twilley denied "dizziness upon standing." (Doc. 6-9, pp. 96-97, 99-100). A March 4, 2015 record states: "vital signs within normal limits . . . no post ictal state noted," and a neurological exam produced normal findings. (Doc. 6-10, pp. 3-4).[4]

An ALJ may consider whether a claimant exhibits residual issues following a seizure. *See Knight v. Berryhill*, No. 4:16-cv-00120-TAB-TWP, 2017 WL 2805053, at *3 (S.D. Ind. Jun. 29, 2017) (ALJ properly considered whether claimant exhibited postictal symptoms following a seizure); *c.f. Barker v. Colvin*, No. 4:15-cv-00257, 2016 WL 5746356, at *11 (D. Idaho Sept. 29, 2016) (ALJ

---

[3] "EEG" refers to "electroencephalogram." EEG, *Dorland's Illustrated Medical Dictionary* (32nd ed. 2012). "MRI" refers to "magnetic resonance imaging." MRI, *Dorland's Illustrated Medical Dictionary* (32nd ed. 2012). "CT" refers to "computed tomography." CT, *Dorland's Illustrated Medical Dictionary* (32nd ed. 2012).

[4] "Postictal" is defined as "occurring after a seizure or sudden attack." Postictal, *Dorland's Illustrated Medical Dictionary* (32nd ed. 2012).

erred in discrediting claimant's testimony because evidence in the record showed claimant had memory problems, slurred speech, and other similar symptoms). The medical evidence does not indicate that Ms. Twilley's seizures caused residual problems. After each of her hospital visits for seizures, the treating doctor reported no residual issues. (Doc. 6-8, pp. 29, 53-55, 61; Doc. 6-10, p. 3).

Substantial evidence supports the ALJ's finding that the "lack of medical treatment and objective abnormalities" undermines Ms. Twilley's testimony concerning the debilitating effects of seizures and migraine headaches.

### 2. Fibromyalgia

Three medical reports relate to Ms. Twilley's fibromyalgia. During a July 1, 2013 emergency room visit for seizures and migraine headaches, Ms. Twilley's doctor noted that she reported a history of fibromyalgia. (Doc. 6-8, pp. 57, 61). On December 23, 2014, and again on January 20, 2015, Dr. Jasser noted that Ms. Twilley denied musculoskeletal problems. (Doc. 6-9, pp. 96-97, 100). Dr. Jasser described Ms. Twilley as: "Pleasant and in no acute distress." (Doc. 6-9, pp. 97, 100). Ms. Twilley has reported that she takes Motrin/ Ibuprofen to treat her pain. (Doc. 6-7, pp. 60, 62).

These normal medical results and the paucity of medical records relating to fibromyalgia support the ALJ's analysis of Ms. Twilley's credibility with respect to her fibromyalgia testimony.

### 3. Asthma

A medical record shows that, on July 1, 2013, Ms. Twilley was admitted to the hospital for "[s]hortness of breath." A chest x-ray revealed: "Limited inspiratory effort. No definite active pulmonary process." (Doc. 6-8, p. 63).[5] On January 1, 2015, after a physical examination of Ms. Twilley, Dr. Jasser reported: "Lungs are clear to auscultation bilaterally. Breath sounds are normal. No rales, rhonchi or wheezes." (Doc. 6-9, p. 100).[6] These two isolated records do not demonstrate that Ms. Twilley sought longitudinal treatment for her asthma. The lack of medical records for asthma treatment supports the ALJ's analysis of Ms. Twilley's credibility with respect to asthma.

---

[5] "Inspiration" is defined as "inhalation." Inspiration, *Dorland's Illustrated Medical Dictionary* (32nd ed. 2012). "Pulmonary" is defined as "pertaining to the lungs." Pulmonary, *Dorland's Illustrated Medical Dictionary* (32nd ed. 2012).

[6] "Auscultation" is defined as "the act of listening for sounds within the body, chiefly for ascertaining the condition of the lungs, heart, pleura, abdomen and other organs, and for the detection of pregnancy or monitoring fetal heart sounds." Auscultation, *Dorland's Illustrated Medical Dictionary* (32nd ed. 2012). "Rales" is defined as "a discontinuous sound (q.v.) consisting of a series of short nonmusical noises, heard primarily during inhalation; called also *crackle*." Rales, *Dorland's Illustrated Medical Dictionary* (32nd ed. 2012) (emphasis in original). "Rhonchus" is defined as "a continuous sounds [] consisting of a dry, low-pitched, snore-like noise, produced in the throat or bronchial tube due to a partial obstruction such as by secretions. Sometimes called *sonorous r*." Rhonchus, *Dorland's Illustrated Medical Dictionary* (32nd ed. 2012) (emphasis in original). "Wheeze" is defined as "a continuous sounds [] consisting of a whistling noise with a high pitch, thought to be generated by gas flowing through narrowed airways. Called also *sibilant* or *whistling rhonchus*." Wheeze, *Dorland's Illustrated Medical Dictionary* (32nd ed. 2012) (emphasis in original).

### 4. Mitral Valve Disorder

On December 23, 2014, Dr. Jasser diagnosed Ms. Twilley with "MITRAL VALVE DISORDERS, with possible significant [mitral regurgitation]." (Doc. 6-9, p. 97) (all caps in medical record).[7] On January 20, 2015, Dr. Jasser examined Ms. Twilley's heart by performing a TEE.[8] The test result indicated that Ms. Twilley had "mild to moderate [mitral regurgitation] only." Dr. Jasser diagnosed mitral valve disorder "with only mild to moderate [mitral regurgitation]." (Doc. 6-9, p. 99). Dr. Jasser did not provide treatment; he ordered Ms. Twilley to follow up in six months. (Doc. 6-9, p. 100).

The administrative record contains no other medical records concerning mitral valve disorder. The ALJ appropriately relied on the limited information concerning mitral valve disorder to evaluate the credibility of Ms. Twilley's testimony concerning her limitations.

### ii. Activities of Daily Living

An ALJ may consider a claimant's daily activities when making a credibility finding. *See* 20 C.F.R. §§ 404.1529(c)(3). When examining daily activities, an ALJ must consider the record as a whole. *Parker v. Bowen*, 793 F.2d 1177, 1180

---

[7] "Mitral" is defined as "pertaining to the left atrioventicular valve." Mitral, *Dorland's Illustrated Medical Dictionary* (32nd ed. 2012). "Regurgitation" is defined as "flow in the opposite direction from normal, as the backward flowing of blood into the heart or between heart chambers." Regurgitation, *Dorland's Illustrated Medical Dictionary* (32nd ed. 2012).

[8] "TEE" is defined as "transesophageal echocardiography." TEE, *Dorland's Illustrated Medical Dictionary* (32nd ed. 2012).

(11th Cir. 1986) (faulting Appeals Council's finding that claimant's "daily activities . . . have not been significantly affected" when the Appeals Council "ignored other evidence that her daily activities have been significant affected"). "[P]articipation in everyday activities of short duration" will not prevent a claimant from proving disability. *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997). "It is the ability to engage in gainful employment that is the key, not whether a plaintiff can perform chores or drive short distances." *Early v. Astrue*, 481 F. Supp. 2d 1233, 1239 (N.D. Ala. 2007); *see Flynn v. Heckler*, 768 F.2d 1273, 1275 (11th Cir. 1985) (claimant who "read[s], watch[es] television, embroider[s], attend[s] church, and drive[s] an automobile short distances.... performs housework for herself and her husband, and accomplishes other light duties in the home" still may suffer from a severe impairment).

Ms. Twilley reported that she has no problem with personal care. (Doc. 6-7, p. 27). She can prepare meals, she does the laundry, and she goes shopping about once per week. (Doc. 6-7, pp. 28-29). Ms. Twilley lives with her sixteen-year-old daughter and seven-year-old son. (Doc. 6-3, p. 48). Ms. Twilley reported that she watches TV, reads, plays with her son, helps him with his homework, and does things with her daughter. (Doc. 6-3, p. 56; Doc. 6-7, p. 30). Ms. Twilley takes her son to school every day unless she has a headache. (Doc. 6-3, p. 55; Doc. 6-7, p. 29; Doc. 6-8, p. 65). Dr. Dana Davis reported that Ms. Twilley checks on her

mother almost daily and socializes with her friends and neighbors daily. (Doc. 6-8, p. 65).

Collectively, Ms. Twilley's daily activities undermine the credibility of her subjective claims that she is disabled by her impairments. Her daily activities constitute substantial evidence that supports the ALJ's decision to discount Ms. Twilley's statements regarding the debilitating nature of her impairments.

### iii. Summary

In sum, the ALJ stated specific reasons for discrediting Ms. Twilley's testimony, and substantial evidence supports the ALJ's decision. *See, e.g., Brown v. Comm'r of Soc. Sec.*, 442 Fed. Appx. 507, 513-14 (11th Cir. 2011) (ALJ sufficiently assessed credibility of claimant's testimony where the ALJ thoroughly discussed the claimant's allegations in light of the record as a whole); *Hennes v. Comm'r of Soc. Sec.*, 130 Fed. Appx. 343, 347-49 (11th Cir. 2005) (ALJ properly rejected the claimant's subjective testimony because the testimony was not supported by clinical or laboratory findings and because the testimony was inconsistent with other medical evidence and the claimant's daily activities).

### B. The ALJ did not fail to develop the record.

Ms. Twilley argues that the ALJ failed to develop the record with regard to Dr. Sesay's records. (Doc. 11, p. 23). Ms. Twilley states that prior to her hearing,

her attorney provided the ALJ with a letter from Dr. Sesay, dated July 3, 2014, in which he wrote:

> This is to certify the [sic] Wendy Twilley is a patient of mine. She is suffering from recurrent seizures, headache, and fibromyalgia. She cannot maintain any meaningful work due to the above conditions. She has had multiple admissions and consultations with treatment with no total resolution of symptoms.

(Doc. 6-8, p. 67). Ms. Twilley asserts that the ALJ erred because "the ALJ did not request records from Dr. Sesay prior to the hearing or direct claimant's prior representative to obtain Dr. Sesay's records." (Doc. 11, p. 23). In her brief, Ms. Twilley states that she "requested these records and will submit them when they are received." (Doc. 11, p. 23).

An ALJ must "develop the record where appropriate but is not required to order a consultative examination as long as the record contains sufficient evidence for the [ALJ] to make an informed decision." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007). A reviewing court must determine "whether the record reveals evidentiary gaps which result in unfairness or 'clear prejudice.'" *Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997).

The record contains medical records concerning Dr. Sesay's treatment of Ms. Twilley. (Doc. 6-8, pp. 6-14 (pharmacy records listing Dr. Sesay as prescribing doctor), pp. 15-16 (Regional Medical Center records listing Dr. Sesay as the admitting and attending doctor), pp. 17-19 (Dr. Sesay's summary notes

regarding Ms. Twilley), p. 20 (summary of imaging exam listing Dr. Sesay as ordering physician), p. 36 (discharge report listing Dr. Sesay as attending physician), p. 39 (Springfellow Memorial Hospital Admission Record listing Dr. Sesay as attending/admitting physician), p. 40 (discharge record summary prepared by Dr. Sesay), pp. 50-51 (discharge reports listing Dr. Sesay as attending physician)).  In his letter, Dr. Sesay did not identify documents that would cause the ALJ to believe that the administrative record was incomplete.  (*See* Doc. 6-8, p. 67).

Ms. Twilley has not explained why the ALJ should have requested additional evidence from Dr. Sesay.  Ms. Twilley's attorney did not object that the record was incomplete.  (*See* Doc. 11, p. 23-24).  When an ALJ asks if the record is complete, and a claimant's attorney does not object, "any alleged error the ALJ may have made in not obtaining more recent medical was invited."  *Larry v. Comm'r of Soc. Sec.*, 506 Fed. Appx. 967, 969 (11th Cir. 2013).  At the administrative hearing, Ms. Twilley's attorney told the ALJ that he did not have objections concerning the exhibit file.  (Doc. 6-3, p. 42).

Thus, Ms. Twilley's argument that ALJ failed to develop the record lacks merit.[9]

---

[9] Because Ms. Twilley has not identified or provided medical records that she contends the ALJ should have reviewed (Doc. 11, pp. 23-24), the Court cannot determine whether there are evidentiary gaps in the administrative record.

## C.  The ALJ properly considered Dr. Wilson's opinion.

Ms. Twilley argues that the ALJ did not consider Dr. Wilson's consultative examination.  (Doc. 11, p. 14).  An ALJ must consider every medical opinion.  20 C.F.R. § 416.927(c) ("Regardless of its source, we will evaluate every medical opinion we receive.").  And an ALJ "'must state with particularity the weight given to different medical opinions and the reasons therefor.'"  *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 931 (11th Cir. 2013) (quoting *Winschel*, 631 F.3d at 1179).   Otherwise, a court "cannot determine whether substantial evidence supports the ALJ's decision . . . ."  *Denomme v. Comm'r of Soc. Sec.*, 518 Fed. Appx. 875, 877 (11th Cir. 2013) (citing *Winschel*, 631 F.3d at 1179).

Because Dr. Wilson examined Ms. Twilley only once, the ALJ did not have to give his opinion great weight.  *See Eyre v. Comm'r of Soc. Sec. Admin.*, 586 Fed. Appx. 521, 523 (11th Cir. 2014) ("The ALJ owes no deference to the opinion of a physician who conducted a single examination . . . ."); *Crawford*, 363 F.3d at 1160 (opinion of one-time examining physician is "not entitled to great weight") (citing *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987)).  "An examining physician's opinion is generally given more weight than that of a source who has not examined the claimant."  *Himes v. Comm'r of Soc. Sec.*, 585 Fed. Appx. 758, 765 (11th Cir. 2014).

Dr. Wilson, a licensed psychologist, examined Ms. Twilley on August 5, 2014, in connection with her application for SSI. (Doc. 6-8, pp. 68, 72). Dr. Wilson summarized the results of his examination, stating:

> Ms. Twilley has serious cognitive deficits which would greatly limit her ability to maintain a job. She has serious problems with her short term memory and working memory, and this could relate to the head injury she sustained as a child. She is also very depressed and highly anxious and because of these problems, her ability to withstand the pressures of day to day occupational functioning is highly impaired. She also has serious medical problems which would also make it very difficult for her to work. She is not capable of managing benefits.

(Doc. 6-8, p. 72). Dr. Wilson noted that Ms. Twilley does not see her friends and does not "reply back" to her friends on Facebook. (Doc. 6-8, p. 71). The ALJ gave Dr. Wilson's opinion little weight because she found that the opinion is inconsistent with objective medical evidence. (Doc. 6-3, p. 26.) The ALJ also found the opinion is inconsistent with Ms. Twilley's activities of daily living. (Doc. 6-3, p. 27).

Substantial evidence supports the ALJ's conclusion that Dr. Wilson's evaluation is inconsistent with the medical evidence. For example, in medical reports dated December 23, 2014, and January 20, 2015, Ms. Twilley reported that she did not have psychological problems. (Doc. 6-9, pp. 97, 100). Additionally, in a March 4, 2015 medical report, Kelsey Nelson, RN reported that Ms. Twilley was oriented to person, place, and time, and her memory was intact. (Doc. 6-10, pp. 2-3).

"Although a claimant's admission that she participates in daily activities for short durations does not necessarily disqualify the claimant from disability," an ALJ may consider a claimant's daily activities. *Hoffman v. Astrue*, 259 Fed. Appx. 213, 219 (11th Cir. 2009). Ms. Twilley's report of her daily activities contradicts Dr. Wilson's opinion. (Doc. 6-7, pp. 26-33). Ms. Twilley stated that she is able to concentrate when she watches a movie, and she can follow written and spoken instructions, pay bills, handle a savings account, and use a checkbook. (Doc. 6-7, pp. 29, 31). Ms. Twilley's mother reported that Ms. Twilley has no problems with memory, concentration, completing tasks, or following instructions. (Doc. 6-7, p. 39). This evidence supports the ALJ's decision to give little weight to Dr. Wilson's opinion.

Ms. Twilley did not explain why she has not sought therapy for mental health issues. (Doc. 6-3, p. 27); (Doc. 6-7, p. 62 )(listing medications). Absent an explanation, the ALJ appropriately determined that Ms. Twilley's failure to seek treatment for her mental health was inconsistent with Dr. Wilson's opinion. *See Brown v. Comm'r of Soc. Sec.*, 425 Fed. Appx. 813, 817 (11th Cir. 2011) (ALJ may consider the level of treatment sought by a claimant but may not draw an adverse inference without first considering the claimant's explanation for the failure to seek treatment.).

Substantial evidence supports the ALJ's treatment of Dr. Wilson's opinion. *See Brown*, 425 Fed. Appx. at 817; *Poellnitz v. Astrue*, 349 Fed. Appx. 500, 503 (11th Cir. 2009) (ALJ properly discounted opinion of an examining physician as to marked and extreme limitations based on medical records and claimant's activities of daily living); *Russell v. Astrue*, 331 Fed. Appx. 678, 682 (11th Cir. 2009) (ALJ properly rejected opinion of examining physician in part because the claimant's "other medical records did not support [the examining physician's] opinion").

**D.  The ALJ properly considered Dr. Sesay's opinion.**

Ms. Twilley argues that the ALJ did not properly weigh Dr. Sesay's opinion and did not state the reasons for rejecting the opinion.  (Doc. 11, p. 20).  Dr. Sesay is a treating physician.  An ALJ must give considerable weight to a treating physician's medical opinion if the opinion is supported by the evidence and consistent with the doctor's records.  *See Winschel*, 631 F.3d at 1179.  An ALJ may refuse to give the opinion of a treating physician "substantial or considerable weight . . . [if] 'good cause' is shown to the contrary."  *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004).  Good cause exists when "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) [the] evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Phillips*, 357 F.3d at 1240-41; *see also Crawford*, 363 F.3d at 1159.  The ALJ "must state with

21

particularity the weight given to different medical opinions and the reasons therefor." *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 931 (11th Cir. 2013) (internal quotation marks and citation omitted).

Dr. Sesay provided his opinion in the July 3, 2014 letter discussed above. (Doc. 6-8, p. 67). Again, the letter states:

> This is to certify the [sic] Wendy Twilley is a patient of mine. She is suffering from recurrent seizures, headache, and fibromyalgia. She cannot maintain any meaningful work due to the above conditions. She has had multiple admissions and consultations with treatment with no total resolution of symptoms.

(Doc. 6-8, p. 67). The ALJ explained that she gave little weight to Dr. Sesay's opinion because an ALJ determines the ultimate issue of disability and because Dr. Sesay did not cite objective medical evidence to support his opinion. (Doc. 6-3, p. 32).

Disability determinations are the province of an ALJ. The governing regulations provide that the Commissioner will not accept medical opinions on issues reserved for the Commissioner. 20 C.F.R. § 416.927(d). Disability determinations and determination of a claimant's RFC are "opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case, *i.e.*, that would direct the determination or decision of disability." 20 C.F.R. § 416.927(d) (italics in original). Dr. Sesay's statement concerning Ms. Twilley's ability to perform meaningful work is conclusory and, in

the context of Dr. Sesay's brief opinion, tantamount to a statement regarding disability. Dr. Sesay did not explain how Ms. Twilley's impairments would limit her ability to work. Dr. Sesay did not offer medical evidence or data to indicate the severity of Ms. Twilley's impairments. 20 C.F.R. § 416.927(c)(3)("The more a medical source presents relevant evidence to support a medical opinion, particularly, medical signs and laboratory findings, the more weight [the SSA] will give that medical opinion."). The ALJ did not err in her treatment of Dr. Sesay's opinion.

### E. Ms. Twilley did not raise Listing 12.05(C) in the proceedings before the ALJ.

Ms. Twilley argues that she is entitled to relief on appeal because she meets Listing 12.05(C), the listing for intellectual disabilities. (Doc. 11, p. 15). But Ms. Twilley did not raise Listing 12.05(C) before the ALJ. The Eleventh Circuit has held that before a claimant may receive relief on appeal, the claimant must exhaust her administrative remedies either by identifying her disabling condition in her application for benefits or by discussing the condition during her administrative hearing before an ALJ. *Sullivan v. Comm'r of Soc. Sec.*, 694 Fed. Appx. 670, 671 (11th Cir. 2017). In *Sullivan*, the Court of Appeals stated:

> A claimant applying for disability must prove that she is disabled. *Moore*, 405 F.3d at 1211. And Sullivan was represented by counsel at her hearing before the ALJ. *Cf. Brown v. Shalala*, 44 F.3d 931, 934–35 (11th Cir. 1995) (per curiam) (noting that where a claimant was not represented, the ALJ has a "special duty" to "scrupulously and

conscientiously probe into, inquire of, and explore for all the relevant facts" (quotation omitted)). In a case like this, persuasive authority convinces us that this claim cannot proceed because Sullivan failed to allege it to the ALJ and therefore could not have proven her disability on this basis. *See Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996) (holding the ALJ had "no obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability" (quotation omitted)); *see also Robinson v. Astrue*, 365 Fed. Appx. 993, 995–96 (11th Cir. 2010) (per curiam) (unpublished) (same); *Street v. Barnhart*, 133 Fed. Appx. 621, 627–28 (11th Cir. 2005) (per curiam) (unpublished) (same). We therefore find no reversible error by the ALJ on this claim.

*Sullivan*, 694 Fed. Appx. at 671.

Like Ms. Sullivan, Ms. Twilley was represented by counsel at her administrative hearing before the ALJ. (Doc. 6-3, p. 41). Ms. Twilley did not mention an intellectual disability in her Disability Report or in her Function Report. (Doc. 6-7, pp. 13, 31). During her administrative hearing, Ms. Twilley spoke about short-term memory issues, but she attributed those memory issues to seizures, not to an intellectual disability. (Doc. 6-3, pp. 60-61). The relevant exchange is as follows:

Q.      Okay.   Dr. Wilson in his report, which is very extensive, indicated that you had serious problems with short-term memory; is that true?

A.      Yes.

Q.      Do you have trouble remembering what's happened recently?

A.      Yes.

Q.      Is that on a regular daily basis?

A.      Sometimes, yes.

Q.      Well, do you have - - do you have memory troubles every day, or just a few - -

A.      No.  Just - -

Q.      - - days a week, or what?

A.      - - a few days.  Whenever I have a seizure, I can't remember anything.

(Doc. 6-3, pp. 60-61).

Consequently, as in *Sullivan*, Ms. Twilley's claim based on Listing 12.05(C) cannot proceed because she did not present the theory of intellectual disability to the ALJ and therefore did not prove an intellectual disability.  Even though there is some evidence in the administrative record that would be relevant to an allegation of disability under Listing 12.05(C), the ALJ was not obligated to investigate the claim because Ms. Twilley did not identify the alleged intellectual disability in her application or during her administrative hearing.[10]

---

[10] Ms. Twilley raised Listing 12.05(C) in a previous application for SSI.  In a decision that he issued in 2012, the presiding ALJ discussed the evidence relating intellectual disability at length and concluded that of the available IQ scores, the valid score was a full scale IQ of 81.  Thus, the ALJ found that Ms. Twilley does not meet the criteria for Listing 12.05(C).  (Doc. 6-4, pp. 25-26, 38).

## V. CONCLUSION

For the reasons stated above, after careful consideration of the administrative record and the parties' briefs, the Court affirms the Commissioner's final decision. The Court will enter a final order consistent with this opinion.

**DONE** this 4th day of April, 2019.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE